**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LADREANA EDWARDS, derivatively on behalf of VOLTA, INC., | ) )  Case No. ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SCOTT MERCER, FRANCOIS P. CHADWICK, CHRISTOPHER WENDEL, ELI AHETO, VINCENT T. CUBBAGE, MARTIN LAUBER, KATHERINE J. SAVITT, BONITA C. STEWART, and JOHN J. TOUGH | ) )  JURY TRIAL DEMANDED ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| VOLTA, INC., | ) ) |
| Nominal Defendant. | ) ) |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff LaDreana Edwards ("Plaintiff"), by and through her counsel, derivatively on behalf of Nominal Defendant Volta, Inc. ("Volta" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Volta with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Volta; (iii) two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California captioned *Kampe v. Volta Inc.*, Case No. 22-cv-02055-JST and *Alvarez v. Volta Inc.*,

Case No. 22-cv-02730-JST (collectively, the "Securities Class Actions") alleging the issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, between August 2, 2021 and March 28, 2022 (the "Relevant Period") with respect to Volta's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Volta.

## NATURE OF THE ACTION

1.    This is a stockholder derivative action asserting claims for breach of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of federal securities laws for violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder brought on behalf of nominal defendant Volta against certain officers and members of the Company's Board of Directors (the "Board").

2.    Volta was founded in 2010 and is headquartered in San Francisco, California.  The Company operates a network of smart media-enabled electric vehicle ("EV") charging stations in the United States. As of December 31, 2021, it had installed 2,264 chargers across 23 territories and states.

3.    Volta partners with real estate and retail businesses to locate and deploy its EV charging stations. The Company generates revenue from advertising on its content-driven charging stations, installing and maintaining the charging stations, and delivering electricity at the charging stations.

4.    On August 26, 2021, Volta Industries, Inc. ("Legacy Volta"), a private entity, and Tortoise Acquisition Corp. II, a special purpose acquisition company, completed a business combination pursuant to which the combined entity was named Volta, Inc. (the "Business Combination").

5.     On February 8, 2021, the Business Combination was announced along with the proposed terms of the merger (the "Business Combination Agreement"). The Business Combination Agreement, *inter alia*, provided for the distribution of restricted stock units ("RSUs") to Defendants Scott Mercer ("Mercer") and Christopher Wendel ("Wendel") (the "Founder Incentive Adjustment Plan").

6.     Upon the completion of the Business Combination on August 26, 2021, the Company distributed RSUs in accordance with the Business Combination Agreement and Founder Incentive Adjustment Plan to Defendants Mercer and Wendel.

7.     On November 10, 2021, Volta announced its financial results for the third fiscal quarter ended September 30, 2021 ("3Q 2021"). The 3Q 2021 financial results showed that the Company's selling, general, and administrative expenses were $29 million, resulting from a one-time expense related to non-cash stock-based compensation of $4.2 million, totaling a $43.1 million net loss for 3Q 2021.

8.     Then, on March 2, 2022, after the market closed, Volta revealed that the financial impact of the restatement was greater than previously disclosed. Specifically, the Company filed an amended Form 8-K with the SEC noting that:

> The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively.

9.     On this news, the Company's stock price fell $0.11 per share, or 2.6%, from trading at $4.12 per share at close on March 2, 2022 to close at $4.01 per share on March 3, 2022. The stock price fell another $0.23 per share, or 5.7% the following day, from $4.01 per share at close on March 3, 2022 to $3.78 per share at close on March 4, 2022.

10.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants breached their fiduciary duties by failing to disclose to investors that: (1) Volta failed to properly account for the grant date of RSUs issued in connection to the Business Combination; (2) due to the foregoing, Volta understated its net loss for 3Q 2021; (3) there were material weaknesses in Volta's internal control over financial reporting that caused material error; (4) due to the foregoing, Volta would restate its financial statements; (5) as a result, Legacy Volta's founders would resign from the Company; (6) due to the foregoing, Volta's financial results would be negatively impacted; and (7) the Company failed to maintain internal controls. As a result of the foregoing, Volta's public statements were materially false and misleading at all relevant times.

11.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Volta has sustained damages as described below.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

13.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Volta is a Delaware corporation. In addition, Volta's Certificate of Incorporation includes an exclusive forum selection clause requiring all derivative actions in which the Court of Chancery of the State of Delaware does not have subject matter jurisdiction, such as the case here, be brought in this Court.

## PARTIES

17.     Plaintiff is a current shareholder of Volta common stock. Plaintiff has continuously held Volta common stock since February 8, 2021.

18.     Nominal Defendant Volta is a Delaware corporation with its principal executive offices located at 155 De Haro Street, San Francisco, CA 94103. Volta's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "VLTA."

19.     Defendant Mercer is a co-founder of Legacy Volta and served as the Company's CEO during the Relevant Period. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Mercer received $179,423,048 in total compensation from the Company. This included $437,500 in salary, $500,000 in bonus, $178,402,500 in stock awards, and $83,048 in other compensation.

20.     Defendant Francois P. Chadwick ("Chadwick") served as the Company's CFO during the Relevant Period. For 2021 Fiscal Year, Defendant Chadwick received $9,671,612 in total compensation from the Company. This included $280,000 in salary, $400,000 in bonus, $6,464,697 in stock awards, $2,515,000 in option awards and $11,915 in other compensation.

21.     Defendant Wendel is a co-founder of Legacy Volta and served as the Company's President during the Relevant Period. For the 2021 Fiscal Year, Defendant Wendel received $151,965,715 in total compensation from the Company. This included $391,667 in salary, $450,000 in bonus, $151,041,000 in stock awards, and $83,048 in other compensation.

22.     Defendant Eli Aheto ("Aheto") has served as a Company director since August 2021, after the Business Combination. Prior, he served as a director for Legacy Volta from October 2016 to August 2021. He is also Chair of the Audit Committee.

23.     Defendant Vincent T. Cubbage ("Cubbage") has served as Volta's Interim CEO since June 2022 and as a Company director since August 2021. He is the chair of the Nominating and Corporate Governance Committee and also a member of the Audit Committee.

24.     Defendant Martin Lauber ("Lauber") has served as a Company director since August 2021, after the Business Combination. Prior, he served as a director for Legacy Volta from June 2020 to August 2021. He is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

25.     Defendant Katherine J. Savitt ("Savitt") has served as a Company director since August 2021, after the Business Combination. She is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee, and since her appointment on June 12, 2022, the Chairperson of the Board.

26.     Defendant Bonita C. Stewart ("Stewart") has served as a Company director since March 2021. She is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

27.     Defendant John J. Tough ("Tough") has served as a Company director since August 2021, after the Business Combination. Prior, he served as a director for Legacy Volta from May

2019 to August 2021. He is the chair of the Compensation Committee and is also a member of the Audit Committee.

28.     The defendants referenced above in ¶¶ 19-27 are referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Volta were required to, among other things:

a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b) conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

32. Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property

and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     In addition, the Company has adopted a Code of Business Conduct and Ethics (the "Code"). The Code states in pertinent part:

> Volta Inc. […] is committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations . . . The Company has adopted this Code to set expectations and provide guidance applicable to all members ("directors") of the Company's Board of Directors (the "Board") and officers, employees, independent contractors and consultants of the Company (all such persons for purposes of this Code, "employees").
>
> ***
>
> The Company expects all of its directors, executive officers, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its employees and foster a culture of fairness, honesty and accountability within the Company. The Company also expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf.
>
> ***
>
> All directors and employees are expected to comply with the law while performing their duties to the Company.
>
> ***
>
> In order to make good decisions for the Company, directors and employees need to be aware of their own biases and make sure they counter them. Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict.
>
> A "conflict of interest" occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole. Sometimes conflicts of interest arise when an employee takes

some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company.

***

The Company strives to maintain integrity of the Company's records and public disclosures. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosures, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;

- the transactions must be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

- employees comply with the Company's system of internal controls and held accountable for their entries;

- any off-balance sheet arrangements for the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the [SEC] and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosures to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's book and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in additional to complying with all applicable law, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with this Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with the Company's disclosures controls and procedures and internal controls over financial reporting.

*** 

The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside the Company. As such, the Board requires that the Chief Executive Officer and senior personnel in the Company's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Vice President of Finance, Controller and any other persons performing similar functions ("**_Senior Financial Employees_**"):

- Act with honestly and integrity and use due care and diligence in performing their responsibilities to the Company.

*       *       *

- Provide Constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

- Comply with applicable laws, rules, and regulations of federal, state and local governments and of any applicable public or private regulatory and listing authorities.

- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

34.     In addition, the Audit Committee Charter of the Board (the "Audit Committee Charter") places increased duties and responsibilities upon the members of the Company's Audit Committee, Defendants Aheto, Cubbage, and Tough (the "Audit Committee Defendants").

35.     Per the Audit Committee Charter, the overarching duties of the Audit Committee and its members include:

- Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

- Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulator requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

- Provide the Board with the results of its monitoring and recommendations derived therefrom; and

- Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

36.    More specifically, the responsibilities of the Audit Committee and its members

include:

Review on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

*       *       *

Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10Q, using professional standards and procedures for conducting such reviews;

Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

Review before release the unaudited quarterly or annual operating results (or financial outlook or guidance) to be stated in the Company's quarterly earnings

release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information;

\* \* \*

Review any reports by management or internal auditors, if any, regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and review before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

\* \* \*

Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

Review and discuss with management, the independent auditor and the internal auditor, if any, the Company's major enterprise risk exposures and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board.

37.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Volta.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

38.     Volta, a Delaware corporation, was founded in 2010 and is headquartered in California. The Company operates a network of smart media-enabled EV charging stations in the United States. As of December 31, 2021, it had installed 2,264 chargers across 23 territories and states.

39.     Volta partners with real estate and retail businesses to locate and deploy its electric vehicle charging stations. The Company generates revenue from advertising on its content-driven charging stations, installing and maintaining the charging stations, and delivering electricity at the charging stations.

40.     On February 8, 2021, the Business Combination was announced along with the proposed terms of the merger. The Business Combination Agreement, *inter alia,* provided for the distribution of RSUs to Defendants Mercer and Wendel under the Founder Incentive Adjustment Plan, a plan to provide RSU awards to Defendants Mercer and Wendel, covering up to 10,500,000 shares of Volta common stock.

41.     On August 26, 2021, Legacy Volta, and Tortoise Acquisition Corp. II, a special purpose acquisition company, completed the Business Combination.

42.     Upon the completion of the Business Combination, the Company distributed RSUs in accordance with the Business Combination Agreement and the Founder Incentive Adjustment Plan to Defendants Mercer and Wendel.

**FALSE AND MISLEADING STATEMENTS BY THE INDIVIDUAL DEFENDANTS**

43.     On August 2, 2021, the Company filed its proxy statement and prospectus on Form 424B3 (the "Proxy Statement"), soliciting stockholder approval of the Business Combination. The Proxy Statement stated that, following the closing of the Business Combination, "Messrs. Mercer and Wendel will hold approximately 37.3% of the voting power" of the Company because they held all of the issued and outstanding Class B common shares. Class B shares have ten votes per share, while Class A shares have one vote per share.

44.     Notably, under "Risk Factors," the Proxy Statement stated, in relevant part:

> *If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed*.

Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

(Emphasis added).

45.     The Proxy Statement also reported *selected* financial data for Legacy Volta,

including:

Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021.

Network Development revenue decreased by $1.3 million, or 57%, from March 31, 2020 to March 31, 2021, primarily due to a decrease in installation service revenue of $0.7 million due to less construction activity occurring in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 and a decrease in infrastructure sales of $0.8 million due to no infrastructure sales occurring in the first quarter of 2021, offset by an increase in operations and maintenance revenue of $0.2 million due to an increase in the number of cumulative completed projects.

Charging Network Operations revenue decreased by $0.5 million, or 100%, from March 31, 2020 to March 31, 2021, due to no regulatory credit sales occurring in the three months ended March 31, 2021.

Volta has earned $0.2 million in Network Intelligence revenue since it began generating Network Intelligence revenue in November 2020.

*        *        *

*Selling, General and Administrative*

Selling, general and administrative expenses increased by $50.3 million, or 475%, for the three months ended March 31, 2021 as compared to the three months ended March 31, 2020. This was primarily driven by an increase in non-cash stock-based

compensation of $45.3 million, driven primarily by the issuance of restricted stock awards to executive employees in the first quarter of 2021. This was also driven by an increase in legal, finance, tax and accounting services expense of $1.4 million, an increase in payroll costs for salaried employees of $1.7 million and an increase in research and development prototyping expense of $1.2 million related to charging technology improvement efforts. The payroll related cost increase was mainly driven by an increase in Volta's salaried employee headcount to 153 from 136 for the three months ended March 31, 2021 and 2020, respectively.

*      *      *

*Net Loss*

Net Loss increased by $52.1 million, or 397%, from March 31, 2020 to March 31, 2021, primarily due to an increase of $1.1 million in cost of revenues, an increase of $51.1 million in operating expenses and an increase in interest expense of $0.6 million, partially offset by a $0.8 million increase in revenue.

46.   The Proxy Statement also disclosed certain material weaknesses in Legacy Volta's internal control over financial reporting:

In connection with the preparation and audit of Volta's consolidated financial statements for the years ended December 31, 2020 and 2019, material weaknesses were identified in its internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control over financial reporting were identified as material weaknesses:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

47.    On August 26, 2021, the Company announced the closing of the Business Combination. On the same date and pursuant to the Business Combination Agreement and the Founder Incentive Adjustment Plan, 5,516,937 shares of Class B Common Stock of Legacy Volta held by Defendant Wendel were converted into 6,694,804 shares of Class A Common Stock of Volta. Likewise, on the same date, and also pursuant to Business Combination Agreement and the Founder Incentive Adjustment Plan, 4,864,249 shares of Class B Common Stock of Legacy Volta held by Defendant Mercer were converted into 5,902,767 shares of Class A Common Stock of Volta. The issuance of Defendants Wendel's and Mercer's shares was approved by the Board.

48.    On November 10, 2021, Volta announced its third quarter 2021 financial results in a press release that stated, in relevant part:

**Results for Third Quarter 2021**

Revenue grew 77% YoY to $8.5 million, compared to $4.8 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce. Behavior and Commerce revenue grew to $7.4 million from $2.2 million in the prior-year period, primarily due to increased sales of media campaigns with national brands. Network Development revenue decreased YoY due to a decrease in customer-owned installations.

\*        \*        \*

Selling, general and administrative expenses were *$29.0 million*, compared to $9.0 million in the prior-year period. This was primarily due to planned growth initiatives that resulted in increased costs, including bonuses and commissions of $2.2 million and additional insurance costs of $1.2 million, ***with one-time expenses related to non-cash stock-based compensation of $4.2 million*** and professional services fees of $3.2 million incurred related to the de-SPAC process.

***Net loss was $43.1 million***, compared to a loss of $14.5 million in the prior-year period, and earnings before interest, taxes, depreciation and amortization (EBITDA) was a loss of $38.3 million compared to a loss of $9.5 million in the prior-year period.

*       *       *

**Full Year 2021 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2021, the Company expects:

- Revenue in the range of $32 million to $36 million

- Total signings to be in the range of 600 sites to 700 sites

- Total operational stalls in the range of 2,300 to 2,500, with 1,300 plus stalls in our construction queue.

(Emphasis added.)

49.   On November 12, 2021, Volta filed its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"), substantially affirming the previously reported financial results. Specifically, it stated, in relevant part:

Compensation expense related to stock-based awards was recorded in selling, general and administrative in the condensed consolidated statements of operations and comprehensive loss for $4.6 million and $0.3 million for the three months ended September 30, 2021 and 2020, respectively, and $51.4 million and $0.8 million for the nine months ended September 30, 2021, and 2020 respectively.

50.   The 3Q21 10-Q reiterated the previously disclosed material weaknesses:

As disclosed in our prospectus filed pursuant to Rule 424(b)(3) of the Securities Act on September 29, 2021, in connection with the preparation of Volta's condensed consolidated financial statements as of and for the years ended December 31, 2020 and 2019, certain material weaknesses were identified in Volta's internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's interim or annual condensed consolidated financial statements will not be prevented or detected on a timely basis. The material weaknesses were as follows:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity

19

transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

51.   Once again, under "Risk Factors," the 3Q21 10-Q stated, in relevant part:

***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.***

Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

(Emphasis added.)

52.     On February 25, 2022, after the market closed, Volta filed a Form 8-K with the SEC stating that its Audit Committee determined that the Company's third quarter 2021 financial statements would be restated. The Company stated, in relevant part:

> On February 24, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Volta Inc. (the "Company" or "Volta") reached a determination that the Company's unaudited condensed consolidated financial statements and related disclosures included in its Quarterly Report on Form 10-Q for ***the three and nine months ended September 30, 2021 (the "Relevant Periods") contained an understatement of stock-based compensation resulting in an understatement of the Company's net loss. The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of stock-based compensation in the Relevant Periods.*** Upon further review, the Company determined the correct grant date under Audit Standard Codification 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.
>
> The understatements during the Relevant Periods relate to stock-based compensation expense for certain of the Company's RSUs granted pursuant to the Company's Founder Incentive Plan, which was approved in connection with the Company's business combination with our predecessor entity, Tortoise Acquisition Corp. II, pursuant to the Business Combination Agreement and Plan of Reorganization, dated as of February 7, 2021, by and among Volta, SNPR Merger Sub I, Inc., SNPR Merger Sub II, LLC, and Volta Industries, Inc.
>
> The Company, in consultation with the Audit Committee, has determined that (i) the unaudited condensed consolidated financial statements and similar communications by the Company relating to the Relevant Period should no longer be relied upon and (ii) ***it is appropriate to correct the error resulting in the understatements for the Relevant Periods by restating such unaudited condensed consolidated financial statements because the understatements are material to the Company's previously issued unaudited condensed consolidated financial statements***. The Company notes that:
>
> - The adjustments do not impact revenue as presented on the consolidated statements of operations and comprehensive loss for the Relevant Period.
>
> - The adjustments do not affect the total cash flows from operating, investing or financing activities as presented on the condensed consolidated statements of cash flows for the Relevant Period.

- While the understatements impact the timing of recognizing stock-based compensation expense, they do not impact the number of shares awarded, the timing of issuance of shares, or the aggregate amount of equity-based compensation expense to be recognized from the awards.

- The Company's management and the Audit Committee have determined the understatements were unintentional and were not the result of fraud or any other attempt to deceive.

*Preliminary Estimated Impact of Understatements*

The Company intends to restate its financial statements for the Relevant Periods, which will be addressed in an amendment to the Form 10-Q for the quarter ended September 30, 2021, to record the understatements. The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, ***resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively.***

(Emphasis added.)

53.    The above statements identified in ¶¶ 43-46 and 48-52 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors: (1) that Volta had improperly accounted for restricted stock units issued in connection with the Business Combination; (2) that, as a result, the Company had understated its net loss for third quarter 2021; (3) that there were material weaknesses in the Company's internal control over financial reporting that resulted in a material error; (4) that, as a result of the foregoing, the Company would restate its financial statements; (5) that, as a result of the foregoing, Legacy Volta's founders would imminently exit the Company; (6) that, as a result, the Company's financial results would be adversely impacted; and (7) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**THE TRUTH BEGINS TO EMERGE**

54.     The truth began to emerge on March 2, 2022, after the market closed, when Volta revealed that the financial impact of the restatement was greater than previously disclosed. Specifically, the Company filed an amended Form 8-K with the SEC noting that:

> The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively.

55.     On this news, the Company's share price fell $0.11, or 2.6%, to close at $4.01 per share on March 3, 2022, on unusually heavy trading volume.

56.     The above statements identified in ¶ 54 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (1) as a result of material errors in the Company's financial statements, Legacy Volta's founders would imminently exit the Company; (2) as a result, the Company's financial results would be adversely impacted; and (3) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**THE TRUTH CONTINUES TO EMERGE**

57.     The truth continued to emerge on March 21, 2022 when Volta announced that it would reschedule its fourth quarter and full year 2021 financial results, which had been expected to be released that day. In a press release, the Company stated:

> Volta Inc. ("Volta" or "the Company") (NYSE: VLTA), today announced that it will be rescheduling its fourth quarter and year end 2021 conference call once it completes the necessary review of its financial results. Today, the Company will file an amendment to its quarterly report on form 10-Q for the quarter ended September 30, 2021.

58. On this news, the Company's share price fell $0.38, or 8.4% to close at $4.12 per share on March 21, 2022, on unusually heavy trading volume.

59. On March 22, 2022, Volta filed its amended 3Q21 10-Q. According to the explanatory note, the restatement was to correct the accounting for the Company's stock-based compensation, which had been understated:

> In connection with the preparation of the Company's financial statements for the year ended December 31, 2021, the Company reviewed its grant agreements for equity-based awards to determine stock-based compensation expense. Based on this review, the Company determined that it improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs"), resulting in an understatement of stock-based compensation for the three and nine months ended September 30, 2021. Stock-based compensation expense for these RSUs should have been recognized during the reporting period ending September 30, 2021 as the accounting grant date for these grants occurred during that period. The impact of correcting the error is to shift the reporting period in which stock-based compensation is recognized, resulting in an increase of previously reported net loss by $26.7 million for the quarter ended September 30, 2021. As previously disclosed in the Company's unaudited condensed consolidated financial statements for the quarter ended September 30, 2021, the Company's management and the Audit Committee of the Company's Board of Directors determined that material weaknesses existed in the Company's internal control over financial reporting due to the lack of formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions, commensurate with its accounting and reporting requirements, and due to the lack of effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements, specifically program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration. These material weaknesses in the Company's internal control over financial reporting that resulted in the understatement of stock-based compensation.

60. The amended 3Q21 10-Q also restated the evaluation of the Company's controls and procedures to disclose that material weaknesses in Volta's internal controls led to a material error in its financial statements:

> As discussed in the Explanatory Note to this Amendment No. 1 and in connection with the Restatement of our unaudited condensed financial statements as of, and for

the three and nine months ended, September 30, 2021, we determined that our previously reported material weaknesses, namely that our review control over the completeness and accuracy of our stock-based compensation reporting and program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration did not operate effectively, resulting in a material error in the financial statements.

61.    The above statements identified in ¶¶ 57, 59-60 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that: (1) as a result of material errors in the Company's financial statements, Legacy Volta's founders would imminently exit the Company; (2) as a result, the Company's financial results would be adversely impacted; and (3) as a result of the foregoing, the Individuals Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

62.    Then, on March 28, 2022, Volta announced that its founders, defendants Mercer and Wendel, had resigned from their positions as CEO and President, respectively, and from the Board. In connection with their resignations, the Company announced that Defendants Mercer and Wendel "are converting their existing Class B share holdings and equity awards to Class A stock."

63.    In a Form 8-K filed the same day, Volta stated:

Mr. Wendel's resignation is effective immediately, while Mr. Mercer will continue as Chief Executive Officer for a transition period ending on the earlier of (i) the date on which the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022. Mr. Mercer will serve as an independent advisor to the Company's board of directors (the "Board") through March 31, 2023.

In connection with their resignations, each of Mr. Mercer and Mr. Wendel (the "Executives") has resigned as a member of the Board, effective immediately, Vincent T. Cubbage and Katherine J. Savitt have been appointed as Co-

Chairpersons of the Board and Ms. Savitt has ceased to be Lead Independent Director.

64.    On this news, the Company's share price fell $0.76, or 18%, to close at $3.37 per share on March 28, 2022, on unusually heavy trading volume.

## DAMAGES TO VOLTA

65.    As a result of the Individual Defendants' improprieties, Volta disseminated improper, public statements concerning Volta's operations, prospects and internal controls. This misconduct has devastated Volta's credibility.

66.    As a direct and proximate result of the Individual Defendants' actions, Volta has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Actions and incurring costs and expenses related to the Company's restatement.

67.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Volta's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

68.    Lastly, the actions of the Individual Defendants have irreparably damaged Volta's corporate image and goodwill. For at least the foreseeable future, Volta will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Volta's ability to raise equity capital or debt on favorable terms in the future is now impaired

## DERIVATIVE AND DEMAND ALLEGATIONS

69.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

71.     Plaintiff is an owner of Volta common stock and was an owner of Volta common stock at all times relevant hereto.

72.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

73.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Volta Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

74.     At the time this action was commenced, the Board consisted of six directors: Defendants Aheto, Cubbage, Lauber, Savitt, Stewart, and Tough (the "Director Defendants"). All members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO DEFENDANTS AHETO, CUBBAGE, LAUBER, SAVITT, STEWART, AND TOUGH BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

75.     Defendants Aheto, Cubbage, Lauber, Savitt, Stewart, and Tough all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

76.     Moreover, the Director Defendants as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the

Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

77. The Director Defendants' conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Volta to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile as to the Director Defendants.

**DEMAND IS EXCUSED AS TO DEFENDANTS AHETO, CUBBAGE, AND TOUGH BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

78. Defendants Aheto, Cubbage, and Tough, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information

provided by the Company, as required by the Audit Committee Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

**DEMAND IS EXCUSED AS TO DEFENDANTS AHETO, LAUBER, SAVITT, STEWART AND TOUGH BECAUSE OF THEIR LONGSTANDING RELATIONSHIPS AND POSITIONS AS DIRECTORS AT LEGACY VOLTA**

79.     Each of Defendants Aheto, Lauber, Savitt, Stewart, and Tough not only serve as current directors of Volta, but each also served together as directors at Legacy Volta.  As such, each of Defendants Aheto, Lauber, Savitt, Stewart, and Tough were acutely aware of how important Legacy Volta's founders were to Volta and the gravity of Legacy Volta's material weaknesses over financial reporting and failed to warn the investing public of the likelihood of Legacy Volta's founders resigning and the severity of Legacy Volta's material weaknesses over financial reporting.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Volta's business and affairs.

82.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

83.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Volta.

84.     In breach of their fiduciary duties owed to Volta, the Individual Defendants willfully or recklessly made and/or caused or permitted the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Volta failed to properly account for the grant date of RSUs issued in connection to the Business Combination; (2) due to the foregoing, Volta understated its net loss for 3Q 2021; (3) there were material weaknesses in Volta's internal control over financial reporting resulting in material error within their financial statements; (4) due to the foregoing, Volta would restate its financial statements; (5) Legacy Volta's founders would resign following the material inaccuracies reported in the Company's financial statements; (6) as a result of the foregoing, the Company would experience adverse impact to its financial results; and (7) the Company failed to maintain internal controls. As a result of the foregoing, Volta's public statements were materially false and misleading at all relevant times.

85.     The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

86.     Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

87.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they

failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

88.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the 4purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

89.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

90.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Volta has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

91.     Plaintiff on behalf of Volta has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants Mercer and Wendel for Unjust Enrichment

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants Mercer and Wendel were unjustly enriched at the expense of, and to the detriment of, Volta.

94.     Defendants Mercer and Wendel benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Volta that was tied to the performance or artificially inflated valuation of Volta, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

95.     Plaintiff, as a shareholder and representative of Volta, seeks restitution from Defendants Mercer and Wendel and seeks an order from this Court disgorging all profits— including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation— obtained by the Defendants Mercer and Wendel due to their wrongful conduct and breach of their fiduciary duties.

96.     Plaintiff on behalf of Volta has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

97.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

99.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

100.     Plaintiff on behalf of Volta has no adequate remedy at law.

### FOURTH CLAIM

#### Against Defendants Mercer and Chadwick for Contribution
#### Under Sections 10(b) and 21D of the Exchange Act

101.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.     Volta, along with Defendants Mercer and Chadwick, are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Mercer's and Chadwick's willful and/or reckless violations of their obligations as officers and/or director of Volta.

103.     Defendants Mercer and Chadwick, because of their positions of control and authority as officers and/or director of Volta, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Volta, including the wrongful acts complained of herein and in the Securities Class Actions.

104.     Accordingly, Defendants Mercer and Chadwick are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u- 4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

105.    As such, Volta is entitled to receive all appropriate contribution or indemnification from Defendants Mercer and Chadwick.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Volta and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Ordering defendants Mercer and Wendel to disgorge compensation obtained as a result of the Business Combination Agreement and their time at Volta as described herein;

D.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 1, 2022

**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
Gabriela A. Cardé
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-1869
Facsimile: (212) 214-0506
Email: fortunato@bespc.com
      carde@bespc.com


    - and -

**HYNES & HERNANDEZ, LLC**
Michael Hynes
Ligaya Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (484) 875-9273
Email: mhynes@hh-lawfirm.com
      lhernandez@hh-lawfirm.com

*Attorneys for Plaintiff*

**LONG LAW, LLC**

By  */s/ Brian D. Long*
    Brian D. Long (#4347)
    3828 Kennett Pike, Suite 208
    Wilmington, DE 19807
    Telephone: (302) 729-9100
    Email: BDLong@longlawde.com

    *Attorneys for Plaintiff*